Again, some very interesting cases, but first I would like to give a shout-out to our colleague, Judge Fernando Rodriguez from the Southern District of Texas. He has consented to join us and help us this week, and we certainly have appreciated it. Thank you, it's been a pleasure. All right, and we urge you, this is a good day to follow your time guidelines when the yellow light comes on, you have two minutes when the red light comes on. We ask you to conclude your presentation unless the court is asking a question. We appreciate record excerpts when you are giving your presentation as well. So with that, we'll start the first case of the day, which is number 2450876, I believe. Let me double-check, Valentine v. Broxton. So I hear from Mr. Scorsio. Thank you, Your Honor. May it please the court. Where there is a fact dispute between the defendants themselves about whether Valentine was kept in solitary confinement because he refused to self-incriminate or for some other reason, the jury should decide. The defendant who was responsible for Valentine's pre-grad investigation, Ms. Broxton, wrote in 2019 that Valentine was excluded from the program and kept in solitary confinement for refusing to answer questions by outside law enforcement. But another defendant with authority over Valentine's exclusion from grad, Mr. Hart, testified the opposite. He said excluding Valentine from grad was unrelated to what happened in this interrogation. This fact dispute underlies each of Valentine's claims. With the court's permission, I'll start by addressing Valentine's Fifth Amendment claim. Valentine raised a genuine fact dispute on each required element of his Fifth Amendment claim. The Supreme Court held in Lefkowitz v. Cunningham in 1977 that state officials violate the Fifth Amendment when they penalize the assertion of the privilege against self-incrimination by imposing penalties or sanctions to compel testimony. To raise a genuine fact dispute on his claim, Valentine needed evidence that the questions he was required to answer were incriminatory and that these answers were being compelled. Well, they deny that, of course. One of the defendants does deny it, Your Honor. However, the other defendant, Ms. Broxton, admits that the reason Valentine was excluded from grad was because he wouldn't answer these questions. You realize, of course, that the whole point of this was to enable him to get out of administrative segregation. I agree, Your Honor, and I think that- And if, and if, A, renouncing gang membership, and B, debriefing, showing that you have renounced by being debriefed to the authorities about what the gang involves, in other words, how they may be killing other people in the prison and smuggling in drugs and so on, to say nothing of the free world, if they're not allowed to use that as a condition to go out of ag-seg, then two consequences follow, do they not? Number one, they'll keep every gang member in ag-seg, or number two, they'll be releasing patently dangerous people. Your Honor, we agree that certainly the prison officials could have required Valentine to renounce the gang, could have investigated and tested that renunciation, and had a variety of tools at their disposal to do that. I think importantly in this case, the defendants themselves testified that that was not what this interrogation was about, and that was not what excluding Valentine from grad was about, and the record evidence I refer to, Your Honor, is that Mr. Hart testified that the interrogation had nothing to do with grad. That's record 636. Well, let's assume that's not a fact issue. I have some doubts about that. Assume it's not a fact issue. Why would that not be a legitimate quid pro quo of getting out of ag-seg? You're not objecting to the idea that the prison system has the ability to put known gang members, especially with very dangerous gangs, into ag-seg, right? You're not disputing that. Your Honor, we don't dispute that. Right. This is all about getting out. And this is a quid pro quo. What's wrong with a quid pro quo? Well, Your Honor, we agree that Valentine had to disassociate, and he could be asked questions about that. We do think where the state officials, Your Honor, have set up the system of administrative segregation such that there is only one way out. Valentine's only way out was through the grad program. Well, actually, that's not true. They review ag-seg, what, on a yearly basis, two times a year? The defendants do assert to this Court that they review ag-seg. Well, this is not an assertion. We've seen cases with that. Yes, Your Honor. The document that they cite for that says that annual reviews and periodic reviews are part of the process, but this document doesn't say what the content of those reviews are, and instead it refers back to the grad program, which we contend is the only way out, and which Ms. Broxson testified that Record 719 was the only way out of grad and who was a knowledgeable witness from her 19-year career. And when the state officials have set up that as the only way out, Your Honor, we do believe that while they can and should investigate the disassociation and they can and should exclude someone for not meeting the requirements, there is a limitation on that, consistent with the Fifth Amendment, that they can't exclude him solely, they can't impose a punishment solely because he refuses to answer self-incriminating questions. There is not a punishment. I think it was a punishment, Your Honor, because there's a causal relationship between excluding Valentine from grad based on the self-incrimination requirement, but for this happening, there's a genuine fact issue that he would have been able to complete grad and get out of administrative segregation. Well, actually, I think that would be highly premature. But anyway, he's out of prison now. He's out on the street, right? He is paroled. But that would have been premature because they never completed the grad investigation because he was kicked out. But he is paroled, Your Honor. And, of course, we only assert damages for the five years that he was kept in solitary confinement after the interrogation. Oh, I was going to say this is not punishment because he has no constitutional right in his classification status. We don't disagree, Your Honor, that there's no constitutional right in the classification per se. But we do believe that he has a right against indefinite solitary confinement with no review. And I base it on this court's decision in Wilkerson v. Goodwin, where the prisoner was in solitary confinement for many years after he had murdered a guard, and the court held that certainly he can be put in solitary confinement for that reason. But after a certain number of years, at most eight years, there has to be some kind of review consistent with due process. Nothing was set up about eight years, number one. And, number two, they do periodic reviews. They do classification reviews of practically everyone in the prison, as I understand it. Yes, Your Honor, I think Wilkerson is informative on this point, too, because the claim in Wilkerson was that the same argument was made there, but the court held that the content of the reviews didn't meet the requirements of process. And as far as this summary judgment record reflects, Your Honor— What happened now about your 14th Amendment claim? Your Honor, Wilkerson is a 14th Amendment case, and I do cite it for our 14th Amendment claim. It is separate, but I think related to Ballantyne's 5th Amendment claim. With regard to these annual reviews, did Mr. Ballantyne get an annual review? In other words, did he have an opportunity every year to submit himself to the grant process and get out of solitary confinement? Your Honor, on the annual reviews, the record doesn't reflect either way whether he was in fact reviewed. I don't think the record—we can accept, Your Honor, that Ballantyne did have opportunities to reapply to grad. I think that wouldn't be material because the record does show that there's a minimum period, I believe, six months between having a grad investigation discontinued and when a prisoner can reapply. So we assert that, at minimum, he has damages for that time, when he was excluded for at least six months from a program he should have been in, but for actions that were wrong and unlawful. So at minimum, Your Honor, I think we can recover damages for that period. The other way, Your Honor, that I think Wilkerson and a liberty interest analysis, while part of the 14th Amendment claim does relate to Ballantyne's 5th Amendment claim, is that when a penalty or a restriction is severe enough to support a liberty interest under the 14th Amendment, it is enough of an atypical and significant hardship that it does support a liberty interest under the 14th Amendment, which— Mr. Scorsese, that gets back to the issue of penalty and punishment. The cases you rely on in the 5th Amendment claim, there was a revocation of privileges, there was movement from a low security to a middle security, there was a change in the status quo for the prisoner. Here, there was no change. He remained in isolation. Do you concede that? And what is the case where the court finds that even though there's no change in the condition, that there's still a possible violation? Well, Your Honor, I think that's Wilkerson because in Wilkerson the case was about whether the prisoner was entitled to review. It wasn't about why he was originally in solitary confinement. And more particularly, Your Honor, to a 5th Amendment claim, I think in McCune the Kennedy plurality is helpful on this question because they were faced with the same issue of was the state imposing a penalty or withdrawing a benefit? And the court said that this was in the eye of the beholder because the difference between, in many of these cases, is someone being penalized or having a benefit taken away. I think this case is a good example of where, again, we say there's a causal relationship between requiring Valentine to self-incriminate, and punishing him by keeping him in solitary confinement until he does. But we think that is a penalty, and we think the penalty-benefit distinction isn't really useful here because he was kept in solitary confinement for an additional five years because he wouldn't self-incriminate. Ms. Broxton testified that... Did Mr. Valentine answer any questions? No, Your Honor, he refused to answer the questions. Can McCune serve as clearly established for purposes of qualified immunity? Yes, Your Honor, it can. First, Your Honor, there's no reason that a Marx analysis can't clearly establish the law, and in fact the Supreme Court has held in Panetti v. Quarterman that a Marx analysis can and does clearly establish the law, and we rely on Justice O'Connor's opinion as the controlling opinion with the narrowest grounds. Additionally, Your Honor, the reasoning in McCune, if not the holding, clearly established that what happened to Valentine violated his Fifth Amendment rights, and I say that because all nine justices agreed that if the compulsion element were met, a prisoner could maintain a Fifth Amendment claim. And, Your Honor, a case like this where the reasoning, if not the holding, clearly establishes the law has been held by the Supreme Court to be sufficient to meet clearly established, and that's from Hope v. Pelzer where the Supreme Court looked at two circuit cases, a case from the Fifth Circuit and a case from the Eleventh Circuit, that it said clearly established the law with the needed specificity. The case from the Eleventh Circuit called Ort v. White was a case that, so to speak, came out the wrong way. It found no violation. But yet the Supreme Court relied on Ort v. White to say that the principles were clearly established sufficient to overcome qualified immunity. But here you're talking about, in McCune you're talking about treatment for sex offenders, and here you're talking about arguably imposing a danger on the entire prison population, including the guards, plus the outside world. And so what do you say about this evidence where, this is why I'm so surprised that he's out of prison now, about the fact that they caught him trying to arrange a hit on somebody and that he was involved with several crimes even after he was quit from the grad program? Your Honor, I think that evidence is not material for a few reasons. First, that is separate and completely different from the reason that the defendants themselves gave at the time. At Record 795, which is Braxton's recommendation to terminate Ballantyne from grad, she said it was failure to answer the questions. And the same thing is present in her contemporaneous document at Record 793, and she testified the same later in this case, that a security reason or a penological interest was not why he was excluded from grad. Well, immaterial is not necessarily the same as inadmissible, and if this case were to go back to trial, it seems to me it would be difficult for you to keep it out. Your Honor, I'm not sure I've considered whether it would be admissible. I certainly think that it's not sufficient at summary judgment, with the facts viewed favorably to Ballantyne, to defeat his claim. In addition to the reason I described, Your Honor, another reason is that the timing of this evidence makes it immaterial because every fact the defendants cite for the alleged point that Ballantyne continued to be active in a gang is either before his dissociation in 2018, or it is after the defendants excluded him from grad for other reasons, unrelated reasons, in 2019. Do we know what the questions were that were put to him at the hearing? Your Honor, we don't have a record or quotations of what the questions were, but we do know that the questions were self-incriminating, and that's because of two pieces of evidence. Oh, excuse me. Go ahead. Excuse me. Your Honor, Broxson testified that the questions were to find out about potential criminal activities that Ballantyne was participating in. That's Record 727. And Broxson admitted that outside law enforcement officers suggested to Mr. Ballantyne they had evidence that could be used to potentially incriminate him. That's Record 729. So Ballantyne has raised a fact dispute on the incrimination element of his Fifth Amendment claim. I'd also like to talk, Your Honor, in my brief remaining time about Ballantyne's Fourteenth Amendment claim. He did raise a genuine fact dispute on the two required elements. Number one, that he had a liberty interest against effectively indefinite solitary confinement, which I believe we discussed. And number two, that the process Ballantyne received wasn't consistent with the minimum requirements of due process. Those minimum requirements, Your Honor, are Ballantyne had to have notice of an adverse decision and an opportunity to be heard. He had no opportunity to be heard because Cundiff conceded that his grievance was denied on improper grounds that she recognizes were unsupported. Thank you, Your Honor. We ask the Court to reverse the judgment. All right. You have opportunity for rebuttal. We'll hear from Mr. Scanlon, who I would like to explain immediately how he got out of prison. He had a 30-year sentence, and he got out after, what, about 20? Thank you, Judge Jones. May it please the Court? Yes, sir. So Mr. Ballantyne qualified for the Serious Offender and Violent Offender Reentry Initiative Program, which is separate from the Grad Program, and it's decided by the Board of Pardons and Paroles. What is that? How do you qualify for that? So this is he was eligible for parole. He never had that taken away from him. And the TDCJ does that program when you have an inmate who is looking at their time coming for them to get out. The incidents that we have cited that are of concern for violence did happen some years ago. This case has been going on for five years, so he was qualified for that program. He successfully completed the program, and the Board of Pardons and Paroles has granted him parole under that program. So the only issue left for the Court to decide is whether Mr. Ballantyne's claims overcome qualified immunity because all he has left is damages claims under Section 1983. And the Court can easily affirm the district court's order granting summary judgment because a proven member of a prison gang has no clearly established constitutional right to control the manner in which he is required to renounce his gang affiliation. I want to talk about the Fifth Amendment claim first, and then I'll turn to the First and Fourteenth Amendment claims. So the Fifth Amendment claim fails for three reasons. First, it's barred under the U.S. Supreme Court's decision in Chavez. Second, there is not evidence that his progress in grad was conditioned on him answering the task force questions. And third, even if there was such a condition, as you just said, Judge Jones, that's a quid pro quo that the case law has held is permissible. It's not a compulsion under the Fifth Amendment. So Chavez requires that a self-incriminating statement be entered into evidence against a defendant in a criminal case for there to be a cognizable Section 1983 claim. Both Justice Thomas's opinion and Justice Souter's concurrence found that the core Fifth Amendment right is not violated unless a impermissible statement is entered into evidence in a criminal case. Here there's no evidence that that ever happened. Well, not that it wasn't going to happen. I mean, why do you have Miranda warnings? So he was not in, I would, I think that when, so, I'm sorry, I'm off track here a little bit. There was no issue about Miranda in the case about, you know, was he in custody. Of course not. So he didn't actually make any self-incriminating statements that we have in evidence in this record. And for that reason. I guess what I'm hearing you say is it's okay for you to make self-incriminating statements that's not any violation of any Constitutional right and have you make self-incriminating statements unless they end up being used against you in private. That's what Chavez says is the Section 1983 violation. Now, if something like that happened, you could still get, you know, something like habeas relief if that happened. You could have your criminal conviction overturned. You could have a motion to suppress granted. But for the purposes of Section 1983 and bringing a civil rights claim, Chavez says that if there's no harm of that nature, it's not recognizable. I want to just talk briefly about the evidence that they claim shows that this condition was imposed. The only documentary evidence there is is Sergeant Broxton's observation that Grad was terminated because he did not cooperate with the task force. And that's about it. There's no evidence of what questions were posed to him. They have some generalizations about the nature of the questions. But there's no evidence of what these task force members actually asked him. So, again, I would just add that there's no cat's paw theory of liability. Well, that's what I was thinking about. You know, Broxton is not the decision maker here, right? Absolutely, Your Honor. It's Ballantyne. Absolutely. Absent cat's paw, if cat's paw is even applicable here, we should disregard Broxton. Absolutely, Your Honor. What is the evidence of, I think it was Hart who made the decision? Is that the? Yes, Judge. What is the evidence that Hart, on what basis Hart made the decision? So Heather Broxton testified at page 714 of the record, how they decide, I don't know, the final decision maker is Jay Hart. Excuse me, Hart. Jay Hart testified that he was going to make this decision one way or another. In fact, he had already decided the grad investigation was going to be terminated before the interview. And there's a good reason that he made the communication to Broxton on the day of the task force interview, because he testified that if they told him ahead of the interview, there would have been no point in even going forward with the interview. So putting all that aside, though, there is no clearly established Fifth Amendment right under what the Supreme Court said in McCune and in Woodard, which is it is permissible to, in the prisoner context, pose a Hobson's choice, where one pathway may lead to self-incriminating evidence, and the other pathway is they invoke their right, but they may suffer a consequence for that. The Ballantyne's counsel relies on cases like Couch for the idea that the government cannot extort information from an individual because it offends our sense of justice. To some degree, is that what's occurring here? The government is hanging a carrot that's quite beneficial, but based on extorting information from the individual? I don't think so, Your Honor. There's not evidence that Jay Hart or Heather Broxton told Ballantyne, hey, if you answer these questions, then, you know, you're good to go on grad. Is it your contention that when he went to the task force meeting, he didn't understand it was part of the grad program? They write in their briefs that when he went there, he didn't know what was happening. He was taken to a room, and it was a surprise to him. What was the time period between the time that he tells, I think it's Sergeant Broxton, that he wants to disassociate and the actual task force? I thought it was a very short period. No, he claims to have disassociated in 2018. The record evidence on this is not clear, to me at least. It looks like he wrote it in a letter at some point in 2018, and then the task force interview was February, late February of 2019. So turning to the 14th Amendment claim, which has been discussed a little bit here, the liberty interest doesn't get satisfied here because you have to look at three factors under what Judge Graves wrote in Wilkerson. The duration, the indefinite, effectively indefinite nature of the confinement, and a baseline comparison of what the conditions are. So, most importantly, it was not of an indefinite nature. For one, we know that he has been released on parole. He had GRAD available to him. He had the Serious Offender and Violent Reentry Initiative, which was available to him. And the fact that GRAD, well, I mentioned GRAD's available to him, so he can control whether he gets out of ADSEC. There's been several district courts that have made this observation and similar claims, and the same is true here. And is your contention, Mr. Scanlon, that 15 years in solitary confinement is not effectively indefinite in nature, or is it not effectively indefinite because he always had the opportunity to disassociate and apply for GRAD? So duration is, I think, a separate factor considered from whether it's effectively indefinite. Duration, I don't know that there are cases that have specifically held. The court did hold in Carmouche that there should be no threshold consideration, and we've seen cases, of course, where people have been in ADSEC for several decades, so I don't know that it's necessarily atypical and significant under that analysis. When was GRAD first available to him? I think it would have been available to him, I believe it would have been around a year after he was placed in ADSEC. And then every year thereafter? As long as he didn't engage in gang activity and he met the requirements, it would have been available to him. And, in fact, it was available to him after he was denied. They told him when they denied, you could apply again in a year. Instead, he goes on this rampage of gang activity within the prison system. So his first amendment claim, just to briefly touch on that, does not survive causation at all. I thought they had periodic classification reviews even apart from GRAD. That's correct, Judge Jones. So the GRAD program is a pathway available for members of security threat groups, and classification review is done for anyone who is placed in ADSEC. So that's process upon process. Well, how frequent was classification review? I believe it's every 30 days, and that's done at the unit level, and then it's yearly by the State Classification Committee. Just to touch on a few points that Mr. Scorcho raised, Sergeant Broxson never testified that he failed to answer questions. And what her notification to Mr. Ballantyne said was that it was a refusal to cooperate with the task force. And what the district court said is important on this. That is clearly an indication that you're not fully disassociated from the gang when you make almost no effort to cooperate with the authorities. The first amendment analysis says that prisoners have to assert a right if they're going to have any claim that's consistent with their prisoner status, and this is completely inconsistent with prisoner status. You know, this reminded me of the situation with police officers who are accused of misconduct, and they can be required to speak without protection of the Fifth Amendment in the disciplinary process. But if they are charged with a crime, that process can't be used against them. That's correct, Your Honor. This seemed to me, if police officers have to make that Hobson's choice, surely it can't be unconstitutional for a gang member to face the same thing to get a lesser classification. Absolutely, Your Honor. And what we've asserted under the Turner v. Safly analysis is that the prison system clearly has a penological interest in determining whether an offender is going to be violent and impose a risk to the rest of the general population. Is there no further questions? A couple on the 14th Amendment issue. On the severity issue, do you agree that the conditions for Mr. Ballantyne are analogous to the conditions at issue in Wilkerson? I don't know. I think what we said in our brief, Judge Rodriguez, is there wasn't any evidence offered to do a baseline comparison between what would the general population conditions be as compared to restrictive housing. And that might seem like a common sense thing. Of course, it's worse. But I think, and I can't remember if it was Wilkerson or Wilkinson that said, that evidence is necessary because sometimes general population prisoners experience conditions that are very harsh even when they're compared. And, of course, the test that both McCune and Wilkinson said is a DNA-typical insignificant hardship in relation to the typical conditions in the prison. Well, we know he was incarcerated for 23 hours a day, right? Yes, Judge Graves. And he was denied any opportunity to have contact with any other inmates. Yes, Judge Graves. Theoretically, but he was putting out notes, right? There is significant evidence in the record. He was writing notes and engaging in activity, gang activity. And what did happen after the decision that he was not eligible for the grad program in terms of appellants appear to be requiring some form of due process, hearings, ability to present evidence? What actually did happen after the denial that he had to wait a year before he could reapply again? Is there any form of hearing or opportunity to challenge that decision? Jay Hart testified that there is an appeal process. But, frankly, we didn't go into that in the briefs. And I think that's because the 14th Amendment claim here under due process, that there was adequate process provided, doesn't address the classification review that was available. That was done in response to the suggestion that filing a grievance was his only way to challenge the grad decision. But, you know, you can bring that information to the committees. Oh, yeah. Did you have another question? Oh, and what about this idea that he was denied due process because his second grievance was rejected? There's no material fact issue on that because he filed two grievances. Vicki Kundiff, although her opinion was that he didn't get the opportunity to really bring forth some of the material in his second grievance, Vicki Kundiff also testified that the second grievance could have been properly denied as redundant because it did contain some of the same assertions that were in the first grievance, which prison rules allow. Don't allow. They don't allow redundancy. Correct. Correct. So you could have a grievance where you're complaining about something, and then in the second grievance you mention the first thing that you grieved about, but you're really complaining about something else. That's what they're saying happened here. So he complained about two days after the interview happened because he was agitated, and then he complained several months later when he got the notice that his pre-grad investigation had been terminated. But it was basically part of the same factual circumstances. So Vicki Kundiff's opinion was, well, we didn't really talk about that, but her testimony also on redirect was, you know, the prison rules actually allow you to deny that grievance. And this court said in the Geiger case that we cited in our brief, there's no liberty interest in having a grievance resolved satisfactorily. With that, we would ask that the court affirm the district court order and dismiss Mr. Valentine's claims.  Thank you. All right. Mr. Scorsese. Thank you, Your Honor. I will try to make five points in rebuttal. Number one, Chavez v. Martinez does not control this case. Chavez v. Martinez is a case about someone being asked to make self-incriminatory statements, making those statements, and whether he can maintain a Fifth Amendment claim for the statements he made. And the case comes out that if they weren't admitted at trial, he can't make them. That's not this case. Valentine never made these statements. Instead, this case is analogous to Lefkowitz v. Cunningham, where Valentine invoked his right, refused to answer, and he was punished or sanctioned in return for that, which the Fifth Amendment prohibits. Number two, Your Honor, I think counsel suggested that because Hart was the decision-maker, Broxton's testimony can't establish a fact issue as to the reason for the decision. That's incorrect, because Broxton testified that it was Hart who instructed Broxton to make the recommendation and to make the decision for the reasons that Broxton articulated. This is records 659 and 725 that Hart said at the time Valentine was being excluded from GRAD because he wouldn't answer the questions and not because he did not meet program requirements. Number three, Your Honor, when asked about the periodic – Who's the decision-maker in this situation? It's Hart, Your Honor. Yes. Number three, Your Honor, when asked about the periodic reviews – Do you dispute the appellee's position that the record indicates that Hart made the decision even before the task force interview? I do dispute that, Your Honor, because Broxton testified the opposite. Broxton – that testimony says that Hart made the decision for reasons unrelated to the interrogation, and again, Hart's position was that he scheduled the interrogation separate from this decision. That's not what Hart told Broxton according to Broxton's testimony. This is records 659 and 725. Broxton says Hart told her at the time Valentine was being excluded from GRAD because he didn't answer these questions and he didn't cooperate in this interrogation. Additionally, Your Honor, when asked about the periodic reviews, I didn't hear counsel say that the periodic reviews could have ever provided a way for an inmate in Valentine's position to ever exit solitary confinement or even articulate what the substance of those reviews was. And what's the purpose of periodic classification reviews throughout the prison? I'm not sure, Your Honor. Well, we've had experience with this, so we'll just have to rely on our experience. Yes, Your Honor, I do refer to – The whole point of classification is that you don't put dangerous prisoners or prisoners who have problems of various sorts into populations where either they will be predators or they will be victims. And that's why you have three or four levels of custody and why you have reviews because things happen. I understand, Your Honor. I just think from this record, Broxton, who was knowledgeable of the process, said that as far as Valentine, the only way he could have exited solitary confinement was through the GRAD program, and I think that's the only evidence I see in this record. Additionally, Your Honor, the defendants can't distinguish – I'm not going to talk about the 14th Amendment claim. The defendants cannot distinguish Valentine's confinement from what this court analyzed in Wilkerson at page 856 of that decision. What the court looked at to see if the solitary confinement was effectively indefinite, sufficient to support a liberty interest, was that it was 23 hours a day, human contact was otherwise cut off, the prisoner couldn't exercise otherwise outside the cell, and the duration. Now, I think there was some back and forth about what duration is sufficient. I don't think the defendants have ever disputed that 15 years is sufficient, and additionally, Your Honor, in another case later, Bailey v. Fisher, which we cite in our brief, this court looked back at Wilkerson and cited Wilkerson and said that two and a half years is a threshold of sorts for when solitary confinement can be considered effectively indefinite. Finally, Your Honor, as to the level of process that Valentine was entitled to and Valentine received, in this case, this is a rare case where the defendant agreed that the only avenue for Valentine to complain about this decision, which was the grievance process which the state has set up, the defendant agreed that the grievance was denied for reasons that were not actually supported. At record 750 to 754, Ms. Cundiff admitted that the grievance was not actually redundant, the grievance was not actually untimely, which were the reasons given on the face of the grievance for his denial. As a result, Your Honor, there is at least a genuine fact dispute, if not conclusively established, that Valentine essentially received zero process to review this decision, and that's not sufficient, consistent with due process. For the reasons I've explained, Your Honor, we ask the court to reverse the judgment. Thank you. All right, sir. We have your argument.